UNITED STATES of America, Appellee,

v.

Joseph SPRIGGS, III, Appellant.

Nos. 94–3067, 94–3097, 94–
3111 and 94–3114.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 17, 1996.

Decided Dec. 17, 1996.

As Amended Feb. 20, 1997.

Rehearing Denied Feb. 20, 1997.

A.J. Kramer, Lisa B. Wright, Philip T. Inglima, Bruce A. Baird, Michele J. Woods, Jonathan Shapiro, Washington, DC and Michael W. Lieberman, Alexandria, VA, were on the joint brief for all appellants.

Michele J. Woods, appointed by the court, argued the cause, Washington, DC, for appellant Joseph Spriggs, III. Bruce A. Baird,

appointed by the court, was with her on the individual briefs. Carol E. Bruce and Lanny A. Breuer entered appearances.

Lisa B. Wright, Assistant Federal Public Defender, argued the cause, Washington, DC, for appellant Gregory Luis deMesones. A.J. Kramer, Federal Public Defender, was with her on the individual briefs. Neil H. Jaffee, Assistant Federal Public Defender, entered an appearance.

Philip T. Inglima argued the cause and filed the individual briefs, Washington, DC, for appellant John E. Adamson. Plato Cacheris entered an appearance.

Jonathan Shapiro argued the cause, Alexandria, VA, for appellant Paul P. Smyth. Michael W. Lieberman was with him on the individual briefs.

Barbara J. Valliere, Assistant United States Attorney, argued the cause, Washington, DC, for appellee. Eric H. Holder, Jr., United States Attorney, John R. Fisher, Katherine Winfree, Virginia Cheatham, and Christine E. Sykes, Assistant United States Attorneys, were with her on the brief. Elizabeth Trosman entered an appearance.

Before: WILLIAMS, KAREN LeCRAFT HENDERSON and TATEL, Circuit Judges.

Opinion for the court filed PER CURIAM.[1]

PER CURIAM:

The four appellants, all salesmen at well-known Washington-area suburban car dealerships, were caught in an elaborate sting operation in which an undercover police officer posed as a big-time District of Columbia drug dealer seeking to buy cars with the cash proceeds of cocaine sales.

The undercover officer, D.C. Police Detective Larry Best, worked under the operational name "Rob" and was part of a FBI/IRS/Metropolitan Police Department task force aimed at uncovering the laundering at suburban car dealerships of drug money generated in the District of Columbia. See Tr. 11/1/93 at 55, 58. Best could not have been clearer about who he was and

what he desired. For example, at his first meeting with appellant deMesones he told him that he worked strictly in cash and that he sold cocaine for a living. See Tr. 11/9/93 at 40. Best also provided deMesones fake District of Columbia drivers' licenses to be used in the required paperwork because, he explained to deMesones, he did not want to use his own name. See *id.* at 41.

The sting followed the same basic pattern through the more than two years of its operation. See Tr. 11/1/93 at 60–62. First there was introductory talk in which Best told the targeted salesman that he wanted to buy cars for cash and that the source of his funds was drug sales. Cooperation followed as the salesman knowingly filled out paperwork with fake D.C. drivers' licenses provided by Best, counted cash in small bills, or drove Best or his undercover partner to pick up bags of cash. All the appellants, except Adamson, accepted substantial cash tips from the ersatz drug dealer, on top of the cash paid to the dealerships. Altogether, the undercover agent completed nine deals to purchase automobiles, including one not charged in the superseding indictment, and spent several weeks setting up a grand finale in which he made five more deals, never consummated, to purchase more than a million dollars' worth of cars that were to be shipped to his supposed drug connection in Colombia.

Best's main contact was appellant Smyth, who arranged contacts with willing salesmen and, just before his arrest, received a $5000 tip from Best for his services helping to put in motion the final deals for cars to be shipped to the supposed drug connection. See Tr. 1/6/94 at 22. As with many of the pertinent conversations, the cash delivery was recorded and the transcript and tape were offered in evidence. See, e.g., Gov. Ex. 14, Tr. 2 at 6.

Appellant deMesones played an important role in three early deals. Not only did the transcripts demonstrate the appellant's awareness of the supposed origins of Best's

---

1. Judge Williams authored sections I.A and I.B, on venue manipulation and jury selection. Judge Tatel authored sections II.A and III.A, on expert testimony and jury instructions on financial transactions.

money, they also caught deMesones seeking payment for structuring the cash deal:

> deMesones: Billy ... Billy ask you for a..ahh, one percent counting fee? ...
>
> Best: He can get it. What you need ... what you need? ...
>
> deMesones: We could do a gee-wiz divided by 3....
>
> Best: Give me a figure....
>
> deMesones: One thousand, a G-wiz divided by three ... 300 a piece.

Gov. Ex. Two, Tr. 8 at 22.

Appellant Spriggs worked for deMesones. On three occasions, he drove to Washington, D.C. to pick up Best and the cash, and his taped conversations amply reflected his understanding that the money came from drug sales. See, e.g., Tr. 11/9/93 at 83–87; Gov. Ex. Two, Tr. 8 at 4. Appellant Adamson knowingly relied on fake identification to fill out paperwork in the cash deals for cars, see Tr. 12/21/93(B) at 78–80, and Best made clear to him the supposed illegal source of the cash. See Gov. Ex. 11, Tr. 3 at 6–7.

Two months after their arrests in January 1993, a grand jury indicted appellants, and numerous other business entities and individuals, on one count of conspiracy to commit crimes against the United States in violation of 18 U.S.C. § 371, as well as numerous counts of money laundering and attempted money laundering in violation of 18 U.S.C. § 1956(a)(3). Besides the many taped conversations, the evidence at the four-month trial included photographs of defendants' meetings with the agent, the falsely completed paperwork, and testimony by Best himself and cooperating defendants.

In February 1994 the jury convicted appellants of money laundering and attempted money laundering but acquitted them of the conspiracy charge. At sentencing Smyth, convicted of 13 of 15 counts, received 108 months in prison. deMesones, convicted of all three money laundering counts with which he was charged, received 57 months. Spriggs, convicted of two of three money laundering counts, received 41 months. Appellant Adamson, convicted of one attempted money laundering count and acquitted of

money laundering and conspiracy, received 57 months.

This appeal followed. We consider both the joint and individual challenges of appellants in the order that they came up at trial, adding factual detail as needed.

## I. Pre–Trial Issues

### A. Manufactured Venue

Appellants acknowledge that, viewing the evidence in the light most favorable to the Government, see *United States v. Chin,* 981 F.2d 1275, 1278 (D.C.Cir.1992), the acts proven supplied an adequate basis for venue in the District of Columbia. But they claim that their convictions should be set aside because "most of the contacts that confer venue in this district were purposefully established," citing a statement in a brief filed before the district court acknowledging that fact. See Brief for Government at 62 (May 28, 1993) (D.D.C., Crim. No. 93–12). For example, agents "purposefully" arranged for defendants to pick-up cash in the District rather than at the suburban dealerships from which the cars were bought. Appellants argue that the Government's goal in arranging these contacts was improper as it was aimed at illegally "manufacturing venue" in the District.

It is unclear exactly what a claim of "manufactured venue" entails. Appellants at some points suggest that the issue is one of "venue entrapment," but then make no claim that they were not predisposed to engage in District-related contacts. As it is, we are uncertain whether there is such a thing as "venue entrapment." It is a little hard to conceive of a person predisposed to commit a federal crime——but not in some specific district. *Cf. United States v. Al–Talib,* 55 F.3d 923, 929 (4th Cir.1995) (rejecting concept of venue entrapment and observing that "if the predisposition to commit the [federal] crime exists, it hardly matters for entrapment purposes where the acts are carried out"). But see *United States v. Toomey,* 404 F.Supp. 1377 (S.D.N.Y.1975) (finding such a lack of predisposition). In any event, there being no suggestion that appellants had even the slightest tendency to balk at the District's

edge, much less the necessary lack of predisposition, we need not resolve that dilemma.

What then is left? There is, of course, the possibility of "a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the Government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973). We may assume without deciding that there would be a fatal impropriety where "the key events occur in one district, but the prosecution, preferring trial elsewhere, lures a defendant to a distant district for some minor event simply to establish venue." *United States v. Myers*, 692 F.2d 823, 847 n. 21 (2d Cir.1982). The concern over a distant district is critical, as "[t]he provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407, 78 S.Ct. 875, 877, 2 L.Ed.2d 873 (1958). But obviously there is nothing distant about the District vis-a-vis its Maryland and Virginia suburbs.

Nor was there anything reprehensible about the agent's deliberate choice to present himself as a drug dealer from the District. That is where the local drug trade is concentrated, just as the sellers of luxury cars so esteemed by drug dealers appear to be concentrated in the surrounding suburbs. The trial court was quite correct in characterizing the District contacts as "integral to the alleged conspiracy." Opinion of July 13, 1993 at 7. *Cf. United States v. Reed*, 773 F.2d 477, 481–82 (2d Cir.1985) (upholding venue in district where crime's effects are felt).

### B. Jury Selection

Appellants make a broad attack on the way the jury was selected, claiming violations of the Jury Selection and Service Act, 28 U.S.C. §§ 1861–1869, and the Sixth and Fifth Amendments. We consider each in turn.

■■■ *Jury Selection and Service Act:* The Act prizes the two related goals of ensuring (1) that juries are selected "at random from a fair cross section of the community" and (2) that "disqualifications, exemptions, and excusals from jury service" are granted only for "objective reasons." See *United States v. North*, 910 F.2d 843, 909 (D.C.Cir. 1990); see also H.R Rep. No. 90–1076 at 4 (1968); S.Rep. No. 90–891 at 15 (1967). We are to grant relief only for "substantial" violations of the Act, see 28 U.S.C. § 1867(a), i.e., those tending to impair the Act's two prime goals, see *United States v. Barnette*, 800 F.2d 1558, 1567 (11th Cir.1986).

We quickly pass over the Government's argument that appellants' claims were not timely made in the district court. It is undisputed that at least one of the appellants met the Act's strict time requirements, see 28 U.S.C. § 1867(a), so we must address the claims. Since the claims fail, however, it makes no difference whether the others made timely objections or are able to benefit from their fellow defendant's having done so. Compare *United States v. Gatling*, 96 F.3d 1511, 1521 (D.C.Cir.1996) (stating that absent an express judicial instruction an objection by one co-defendant is good for all if record of trial suggests that it was the approach "taken by the judge in practice"), with *United States v. Williams–Davis*, 90 F.3d 490, 510 (D.C.Cir.1996) (noting that a co-defendant can "free ride" on the objection of another only if trial judge makes it clear that such a practice will be followed).

Appellants' objections to the process are essentially twofold: first, that the jurors were in effect "volunteers," and second, that the court's hardship excusals were invalid because they failed to fit the criteria of 28 U.S.C. § 1866(c)(1). Although the statute does not in terms bar a jury of volunteers, courts have held that such a jury fails to satisfy the Act's goals of random selection and of exclusion only on objective grounds. See *United States v. Branscome*, 682 F.2d 484 (4th Cir.1982); *United States v. Kennedy*, 548 F.2d 608, 611 (5th Cir.1977). But see *Coleman v. Risley*, 839 F.2d 434, 449 (9th Cir.1988) (holding that prospective jurors randomly asked if they could serve at a particular time were not volunteers). We assume that a truly voluntary jury would violate the Act.

Anticipating a long trial, the trial court caused two groups of potential jurors, Groups "R" and "W," totaling about 300 people, to be given questionnaires asking if they could sit on a jury in a trial expected to last 10–12 weeks, and, if they could not, to give a "detailed explanation." See Defendant Thomas McGeady's Motion to Stay Proceedings at Exhibit 1 (Oct. 4, 1993). A hundred and one said they could. See Tr. 10/7/93(A) at 38. Initially, the trial court excused all of the others who had said they could not serve on such a long trial. See Tr. 10/7/93(A) at 11. After objections from appellants and co-defendants, the district reviewed the questionnaires *in camera* and ordered more than a score of the prospective jurors who had said they could not serve on such a long trial—those who had given inadequate excuses or none at all—to report for voir dire. See Opinion of October 13, 1993 at 4.

The most serious element of appellants' claim that the jurors were volunteers arises out of the jury service terms of the two groups, R and W, that constituted the pool of 300 with which the trial judge started. Counsel stated in a trial affidavit that (on the basis of information from the jury administrator) the R jurors "were the group that had been called for the first part of September," and the W jurors for the second part. See Affidavit of Lisa D. Burget at 2 (Oct. 4, 1993). As the trial was only scheduled to start in October, appellants in their brief characterize the jurors as "having fulfilled their term of service." Appellants' Joint Brief at 16. This indeed makes them sound like true volunteers.

But counsel's own affidavit belies the idea that they had finished their "terms of service." It goes on to report that the jurors excused from this trial were "immediately made available for assignment to panels on other cases anticipated to be of shorter duration." Burget Affidavit at 2–3. Thus we have no reason at all to believe that a single potential juror would have thought that, merely by begging off this trial, he would be free to resume his normal life. Indeed, as we noted in *United States v. Anderson*, 509 F.2d 312, 321 n. 60, 322 & n. 65 (D.C.Cir. 1974), the statute says that no person shall in any two year period be required to "attend court for prospective service as a petit juror for a total of more than thirty days, *except when necessary to complete service in a particular case.*" 28 U.S.C. § 1866(e)(1) (emphasis added). Although the trial in *Anderson* was scheduled to begin within the month in which the jurors were called, it is not apparent why that should make a difference; there is no reason to believe that the obligation to complete service in a trial requires that the trial in question start within a period of 30 *consecutive* days—or that any juror thought so. Although the claim of a "volunteer" jury that we rejected in *Anderson* was based on the Sixth Amendment, not the statute, it is hard to see how that makes a difference, as the court assumed (as we do here) that a truly volunteer jury would be unlawful. Finally, the trial court's order to the persons who invoked inadequate excuses (or none) contradicts the notion that anyone involved in the process supposed service to be voluntary.

The appellants' second theory is that the court's hardship excusals could be lawful only if they fit within § 1866(c)(1)'s provision that "person[s] summoned for jury service may be ... excused by the court ... upon a showing of undue hardship or extreme inconvenience." That section goes on to say that jurors so excused shall either be "summoned again" for jury service or "reinserted into the qualified jury wheel." As we have already observed, counsel's affidavit says that instead the excused jurors were "immediately made available for assignment to panels on other cases anticipated to be of shorter duration." Burget Affidavit at 2–3.

Locating case-specific hardship excusals within the statutory scheme is not simple. The district court decision on the subject was (understandably) ambiguous. While the court invoked § 1866(c)(1) as the basis for the excusals, see Opinion of October 3, 1993 at 5, it also noted that because the jurors were not excused from their periods of jury service, but only from the particular trial, "they were not resummoned nor were their names reinserted into the jury wheel," *id.* at 3–4 n. 3, as that section seems to require.

Section 1866(c) appears to state an exclusive list of bases for excuse or disqualification. It says that, with certain exceptions not evidently applicable, "no person or class of persons shall be disqualified, excluded, excused or exempt from service as jurors: *Provided,* That any person summoned for jury service may be . . .," and then proceeds to enumerate five exceptions. The first, (c)(1), appears to be directed at generic hardship excusals; at least the provision for re-summons and reinsertion in the jury wheel seems to *assume* a generic excuse, as the natural consequence of a case-specific excuse would be simply (as it was here) return to the jury room for possible call to another case. It might be inviting to suppose that § 1866(c) refers *only* to such generic grounds for excuse, but the remaining subsections rule out such a construction. They include exclusion on a peremptory challenge, (c)(3), and "challenge by any party for good cause shown," (c)(4), events that it is hard to imagine outside the context of a specific trial. Subsections (c)(2) and (c)(5) may encompass both the generic and the case-specific. The first covers excusals because of inability to render impartial service or because the juror's service might be disruptive, and the second addresses jurors whose service might threaten the secrecy of the proceedings or otherwise affect the integrity of jury proceedings. The closing sentence of § 1866(c) says that jurors excused "from a particular jury under clause (2), (3) or (4) of this subsection shall be eligible to sit on another jury if the basis for his initial exclusion would not be relevant to his ability to serve on such other jury," evidently reflecting an assumption that those subsections included case-specific excusals. Thus § 1866(c) evidently establishes an exclusive set of criteria for excusals, and appears to cover both generic and case-specific. In invoking its exclusivity provision, appellants are effectively claiming (though they don't clearly acknowledge the sweep of their argument) that the Jury Selection and Service Act completely barred the case-specific hardship excuse.

That reading, however, is impossible to square with the statutory definition of hardship excuses, 28 U.S.C. § 1869(j), which expressly addresses instances where "it is anticipated that a trial or grand jury proceeding may require more than thirty days of service," authorizing consideration even of the employer's interest in such cases.

■ Although no completely satisfactory reading appears available, it seems clear that § 1866(c)(1)'s requirement that a person excused on hardship grounds "be summoned again for jury service" or that his name "be reinserted into the qualified jury wheel for [future] selection" aims at assuring that a hardship excuse valid at one point in time not be turned into a lifetime excuse regardless of changing circumstances. As the trial judge here did not even release the "excused" jurors from their current terms of service, his acts represented de facto compliance with § 1866(c)(1). We thus share the evidently universal assumption of the federal courts that case-specific hardship excuses survive the Jury Selection and Service Act. See, e.g., *United States v. Paradies,* 98 F.3d 1266, 1280–81 (11th Cir.1996); *United States v. Williams,* 927 F.2d 95, 97 (2d Cir.1991). Even if they did not, it is only a "substantial failure" to comply with the act that is to be remedied, see 28 U.S.C. § 1867(a), namely ones tending to defeat the key purposes of the act: random selection of jurors and use of objective criteria for excuses and exemptions. The trial court's provision for case-specific hardship excuses, with its concomitant return of the excused jurors to the jury pool, is not conceivably a ground for relief.

Sixth Amendment: Appellants assert that jury selection here violated the requirement, implicit in the impartiality clause of the Sixth Amendment, that the jury be drawn from a fair cross-section of the community. They say that before the hardship excusals, 26.9% of the veniremen were white, presumably a fair cross-section, while afterwards only 11.9% were.

■ The Supreme Court has identified the following as the elements of a successful claim that jury selection violated the impartiality requirement of the Sixth Amendment by not being drawn from a fair cross-section of the community:

In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group from the jury-selection process.

*Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). Whites being viewed as a distinctive group, the appellants argue that the district court's process for excusing jurors for hardship, described above, systematically excluded them from the venire so that their representation was "not fair and reasonable in relation to the community." It is generally understood that one claiming the absence of a fair cross-section need not show discriminatory intent, as is required for challenges of racial disparities based on the equal protection clause. Compare *Batson v. Kentucky,* 476 U.S. 79, 98, 106 S.Ct. 1712, 1723–24, 90 L.Ed.2d 69 (1986) (purposeful discrimination must be shown in objection to preemptory challenges), with *United States v. Esquivel,* 88 F.3d 722, 725 (9th Cir.1996) ("a Sixth Amendment, fair cross-section violation does not require the appellant to prove discriminatory intent"). Under the view we take of the case, we need not decide whether culling for hardship based on the length of the case would satisfy *Duren*'s third element—that the exclusion has been "systematic."

■ The difficulty with appellants' challenge is that the requirement of a fair cross-section has never been more than a requirement that the jury be *"drawn from* a fair cross section of the community." *Taylor v. Louisiana,* 419 U.S. 522, 527, 95 S.Ct. 692, 696, 42 L.Ed.2d 690 (1975) (emphasis added). In other words, it applies to the group from which any specific jury is to be chosen. In one case, *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Court contingently assumed a requirement reaching the process by which a pool of veniremen was whittled down for the needs of a specific case, but poured a good deal of

cold water on the idea. "We remain convinced that an extension of the fair-cross-section requirement to petit juries would be unworkable and unsound." *Id.* at 174, 106 S.Ct. at 1765.

■ The water became even chillier in *Holland v. Illinois,* 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990), where the Court explained that the requirement of a fair cross-section "is obviously not explicit in [the Sixth Amendment's] text, but is derived from the traditional understanding of how an 'impartial jury' is assembled." *Id.* at 480, 110 S.Ct. at 807. The requirement is thus "a means of assuring, not a *representative* jury (which the Constitution does not demand), but an *impartial* one (which it does)." *Id.*

Appellants point to no case in which a court has applied the *Duren* analysis to case-specific selection practices such as those employed by the trial court in winnowing hardship cases from the initial group of 300 veniremen. To apply the requirement in that phase of the process would seem to compel an analysis of the composition of the jury in each stage of the narrowing down to the final seated panel. We think that to do so would be an unnecessary and perhaps unworkable extension of the requirement that, in order to select an "impartial" jury, the culling be from a fair cross-section of the community.

Fifth Amendment: Appellants also make a challenge based on the Fifth Amendment's ban on purposeful discrimination in the use of peremptory challenges. See *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The prosecutor exercised four of her six strikes against white prospective jurors. See Tr. 10/21/93 at 29. The defense used two of its ten strikes against white jurors, one of whom was also struck by the Government. See Tr. 10/21/93 at 34. As there were only five whites on the jury panel at the time of the strikes, the result was an all-black jury.

■ A *Batson* challenge first requires a prima facie showing of purposeful racial discrimination. See *Batson,* 476 U.S. at 96, 106 S.Ct. at 1722–23; *Purkett v. Elem,* —— U.S. ——, ——, 115 S.Ct. 1769, 1770, 131 L.Ed.2d

834 (1995). The proponent of the strike must then offer a race-neutral explanation, which need not be "persuasive, or even plausible." *Id.* at ——, 115 S.Ct. at 1771. If such an explanation is offered, the court must decide whether the opponent of the strike has proven purposeful discrimination. See *id.*

The district court seemed to assume, without ruling, that a prima facie showing had been made by defendants when he asked the prosecutor for an explanation of her use of preemptory challenges. See Tr. 10/21/93 at 33. The prosecutor's explanation, that she was looking for the "average, typical, born-and-bred District of Columbia resident ... people who had raised families in this city, people who have a stake in our community," Tr. 10/21/93 at 35, clearly satisfied *Purkett*'s modest demands. That leaves the third step, which, as it is a factual determination by the district court, we review only for clear error. See *Hernandez v. New York,* 500 U.S. 352, 365, 111 S.Ct. 1859, 1869, 114 L.Ed.2d 395 (1991) (plurality opinion of Kennedy, J.)

We do not believe that the district judge was clearly erroneous in crediting the prosecutor's explanation of her motives in exercising her strikes. Appellants say that the Government used two thirds of its strikes on a racial group that constituted only 18% of the panel. But the prosecutor explained her decisions in great detail, noting the personal history, professions and statements during voir dire of each of the jurors she struck. See Tr. 10/21/93 at 35–43. The best that appellants can do here is to point out that after the initial *Batson* proceeding, a weekend passed and their counsel returned to the issue, identifying a number of unchallenged blacks who seemed to share characteristics (e.g., absence of marriage or children) that had been among the reasons offered by the prosecution for challenging whites. See Tr. 10/25/93 at 5. Government counsel responded that as to most of these she had expected that the defendants would challenge them, and that the challenges available to her were limited. See Tr. 10/25/93 at 8–9. The trial court, which had counsel in front of it throughout and was in a position to observe her demeanor, accepted her explanation. See *Hernandez,* 500 U.S. at 365, 111 S.Ct. at 1869 (noting that counsel's demeanor may often be the best evidence on the issue). We have no basis for gainsaying that judgment.

*C. Joinder and Severance*

Appellants Spriggs and Adamson also challenge their joinder with the other alleged conspirators and the district court's denials of their motions to sever. We find no reversible error in either the appellants' initial joinder or the district court's decision not to sever their prosecutions.

Spriggs and Adamson maintain that they were misjoined because there was no allegation below supporting a single conspiracy encompassing all of the defendants. Under Federal Rule of Criminal Procedure 8(b), "Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." This court has recognized that joinder is appropriate if there is "a logical relationship between the acts or transactions" so that a joint trial produces a "benefit to the courts." *United States v. Perry,* 731 F.2d 985, 990 (D.C.Cir.1984) (citing *United States v. Jackson,* 562 F.2d 789, 794–96 (D.C.Cir.1977)); see *United States v. Gibbs,* 904 F.2d 52, 56 (D.C.Cir.1990) ("[J]oint trials may be preferred, given the heavy and increasing criminal case load in our trial courts.") (citing *United States v. Manner,* 887 F.2d 317, 324 (D.C.Cir.), *cert. denied,* 493 U.S. 1062, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990)). "In determining whether joinder of multiple defendants in a single prosecution is proper, this circuit permits a trial court to consult the indictment as well as any other pretrial evidence offered by the Government." *United States v. Wilson,* 26 F.3d 142, 153 (D.C.Cir.1994). Thus, Rule 8(b) can be satisfied either by the indictment alone, as "for instance when a conspiracy charge links all the offenses and defendants," or by "[s]ubsequent pre-trial representations." *Perry,* 731 F.2d at 990. Because the indictment here alleges that all of the defendants participated in a single conspiracy,

with the shared goal of "enriching themselves" through a series of similar money laundering transactions under the direction of a single Rosenthal employee and the existence of the common scheme is supported by the Government's pre-trial submissions to the district court, we conclude that joinder of the defendants was proper.

The Government represented below that the charged transaction was arranged by Smyth, as were many virtually identical sales by other indicted Rosenthal employees, and that Adamson knew Best was one of Smyth's "best customers." These allegations suggest Adamson was aware that his sale to Best was only one of a series of similar money laundering sales coordinated by Smyth. As for Spriggs, his alleged participation in three different transactions on three separate occasions, each time assisting appellant deMesones, supports the inference that he knew such sales were not isolated events.

 Even were the counts misjoined, or the severance motion improperly denied, the district court's rulings must be upheld because neither Spriggs nor Adamson has demonstrated any prejudice resulting from them. See *United States v. Brown*, 16 F.3d 423, 427 (D.C.Cir.1994) (preserved challenge to joinder under Rule 8 reviewed for harmless error and severance denial for abuse of discretion, with "defendant carr[ying] the burden of showing that 'his rights to a fair trial have been prejudiced by the joinder'") (citations omitted); *United States v. Nicely*, 922 F.2d 850, 855 (D.C.Cir.1991) ("[T]he harmless error standard now governs review of misjoinder claims and requires a finding of actual prejudice before reversal is appropriate.") (citing *United States v. Lane*, 474 U.S. 438, 448–49, 106 S.Ct. 725, 731–32, 88 L.Ed.2d 814 (1986); Fed.R.Crim.P. 14 (authorizing severance "[i]f it appears that a defendant or the Government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together"). The Government minimized the likelihood of "spillover prejudice," that is, that the jury would use evidence of one defendant's guilt against another, by presenting the evidence of each transaction, consisting largely of tape recordings of the participants' own words, separately and in chronological order. *Cf. United States v. Anderson*, 39 F.3d 331, 348 (D.C.Cir.1994) (finding no prejudice in variance of evidence from indictment where "the evidence against the appellants consisted primarily of discrete telephone conversations to which the individual appellants were parties and which the jurors could readily 'compartmentalize'") (citing *United States v. Toliver*, 541 F.2d 958, 963 (2d Cir.1976)); *United States v. Townsend*, 924 F.2d 1385, 1411 (7th Cir.1991) ("danger of 'spillover prejudice,'" is "minimal ... when the Government presents tape recordings of each and every defendant discussing the distribution of illegal drugs" and "the jury had no need to look beyond each defendant's own words in order to convict"). Further, the district court cured any vestigial risk of such prejudice by repeatedly instructing the jury to consider the evidence against each defendant separately. See Tr. 10/25/93(A) at 28, 29–30; Tr. 11/17/93 at 12; Tr. 1/21/94(A) at 27–28; Tr. 2/2/94 at 57; *Zafiro v. United States*, 506 U.S. 534, 540–41, 113 S.Ct. 933, 938–39, 122 L.Ed.2d 317 (1993) (concluding that similar instructions "sufficed to cure any possibility of prejudice").

## II. Trial Issues

### A. Expert Testimony

The Government's first witness was Special Agent Dwight Rawls of the Food and Drug Administration. The Government offered Rawls, formerly a detective with the Metropolitan Police Department, as an expert in drug distribution, money laundering, and undercover operations. On direct examination, Rawls explained drug terminology the jury would hear on undercover tapes, methods used by drug dealers to launder money, and law enforcement efforts to detect money laundering, including "sting" operations.

Appellants challenge the following testimony elicited from Rawls midway through the Government's direct examination:

Prosecutor: As of December of 1990, what was your information about where D.C. narcotics dealers purchased their vehicles?

Rawls: In December of 1990, the dealers were beginning to move further and further out of the city. *We had a list of dealerships, including Rosenthal and the Virginia group, several of the Maryland groups of dealerships where the people were actually going.* Most of it, and this is based on my interviews of violators and cooperating individuals, that there is sort of an inner circle of word of mouth of who to go see where, at which dealerships and which dealerships where there are less questions asked or the pertinent questions are not asked, and that's basically how it was generated.

Tr. 10/26/93 at 145–46 (emphasis added). On cross-examination, counsel for appellant deMesones elicited similar testimony from Rawls:

My basic testimony is that I interviewed a number of people and I also review a lot of the documents or intelligence reports that come through, and that there were two or three locations in the Rosenthal group that were pointed out as places that you could go if you wanted to purchase a car and needed some assistance in purchasing it with cash.

Tr. 10/26/93 at 165.

Appellants argue that Rawls's testimony about Rosenthal dealerships was hearsay, see Fed.R.Evid. 801(c), and that its admission violated their constitutional right to confront witnesses against them, see *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). Contending that the testimony was irrelevant and prejudicial, that it was evidence of prior bad acts, and that it constituted improper fact testimony by an expert witness, appellants maintain that the district court violated a host of evidentiary rules by admitting the remarks. See Fed. R.Evid. 402, 403, 404(b); *United States v. Thomas,* 896 F.2d 589, 591 (D.C.Cir.1990).

 We agree with the Government that appellants failed to preserve these arguments for appeal. Neither appellants nor any of their co-defendants lodged contemporaneous objections to Rawls's testimony about Rosenthal. Not until a bench conference later in Rawls's cross-examination, called at the behest of the Government, did defense counsel raise concerns about the testimony. See Tr. 10/26/93 at 167–178. At no point during that bench conference did defendants move to strike the remarks. Although defendants asked the district court to strike Rawls's entire testimony the following day, see Tr. 10/27/93 at 98, that motion was neither timely, as required by Rule 103, nor tailored to excise the objectionable evidence. Fed. R.Evid. 103(a)(1) (objection or motion to strike must be timely); see, e.g., *United States v. Pettigrew,* 77 F.3d 1500, 1516 & n. 14 (5th Cir.1996) (motion to strike expert testimony made the following day not timely).

 Because appellants did not make a timely objection to the Rosenthal testimony, we review its admission for plain error. Fed.R.Crim.P. 52(b); see, e.g., *Pettigrew,* 77 F.3d at 1516; *United States v. Zerba,* 21 F.3d 250, 253 (8th Cir.1994). "The plain error exception to the contemporaneous objection requirement should be used sparingly, only for 'particularly egregious errors' that 'seriously affect the fairness, integrity or public reputation of judicial proceedings.' " *United States v. Copelin,* 996 F.2d 379, 383 (D.C.Cir.1993) (quoting *United States v. Frady,* 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982), and *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)). Because the prosecutor did not ask Rawls for his opinion as to where drug dealers were purchasing their automobiles, and because Rawls did not offer such an opinion on his own, we doubt the testimony was admissible under Rule 703. See Fed.R.Evid. 703 (permitting hearsay forming basis of expert opinion); *United States v. Smith,* 964 F.2d 1221, 1223 (D.C.Cir.1992). Appellants have not established, however, that admission of the testimony "affected the outcome of the district court proceedings." *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993). The thrust of appellants' prejudice argument is that Rawls's comments, referred to by the Government in its closing, amounted to evidence of guilt by

association—because Rawls said Rosenthal was corrupt, the jury could have inferred that the individual defendants, employees of Rosenthal, were responsible for the corruption. Further cross-examination, however, revealed that Rawls did not know whether any of the defendants were involved in money laundering at Rosenthal. See Tr. 10/26/93 at 180–82. Moreover, at the defendants' request, the district court instructed the jury that Rawls played no role in the investigation of the Rosenthal dealerships, and that when the Government began its investigation, neither it nor Rawls had evidence that any of the defendants had ever been involved in drug or money laundering transactions. See Tr. 10/27/93 at 107. Because the jury is presumed to follow its instructions, *Zafiro v. United States*, 506 U.S. 534, 540–42, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993), we think the district court's cautionary instruction, repeated three times before the jury began deliberating, cured any possibility of prejudice stemming from Rawls's remarks or the Government's brief references to them in closing argument. Finally, the fact that the jury acquitted seven defendants of all charges, and each appellant of at least one count of the indictment, demonstrates that, rather than attributing guilt based on Rawls's generalization about the Rosenthal dealerships, the jury appears to have properly focused on the evidence of each count against each defendant.

Appellants' remaining arguments concerning Rawls's testimony require little discussion. They claim that because they were not charged with any actual drug dealing, the district court should not have admitted expert testimony about drug trafficking and its terminology. We disagree. The Government offered the testimony to help the jury understand drug terminology it would hear in tape-recorded conversations. Its admission for that purpose was not an abuse of discretion. See *United States v. Walls*, 70 F.3d 1323, 1326 (D.C.Cir.1995) (jurors often need help deciphering jargon of drug trade). We also disagree with appellants' contention that Rawls invaded the province of the jury, in violation of Rule 704(b), by testifying to appellants' predisposition to launder money. While this is a seri-ous claim, see *United States v. Mitchell*, 996 F.2d 419, 422 (D.C.Cir.1993), we find no basis for it in the record. The testimony to which appellants refer in their brief, most offered on cross-examination and without objection, concerned the behavior of undercover officers in various hypothetical situations, not the actions or intentions of defendants. See Tr. 10/27/93 at 160–63; Tr. 10/28/93 at 26–32.

In sum, we find no reason to reverse appellants' convictions based on Agent Rawls's testimony.

### B. Admission of Evidence of Prior Bad Acts

Next, appellant deMesones challenges both the admission of prior bad acts evidence and the prosecutor's reference in closing argument to excluded prior bad acts evidence. During his taped conversations, deMesones told Best, *inter alia*, that he had been convicted of distributing cocaine in 1986, had been imprisoned seven times and had successfully "muled" drugs, smuggling two kilos of cocaine past United States Customs officers. On deMesones's motion, the district court excluded direct evidence of his prior arrests and convictions and of the "muling" incident but admitted taped conversations in which deMesones referred to past drug use and drug dealing and, obliquely, to his arrests and convictions on the ground that the evidence "explains the circumstances of the crimes charged." Tr. 11/16/93 at 100. Despite the court's exclusionary ruling, the prosecutor nevertheless referred to the "muling" incident during rebuttal argument. deMesones maintains that both the court's evidentiary ruling and the prosecutor's comment require reversal. We disagree.

deMesones first argues the admitted prior bad acts evidence should have been excluded because (1) the statements were probably not true and (2) they were too dissimilar to the charged offenses to be relevant to deMesones's predisposition, the only arguably permissible ground for admission, see *United States v. Neville*, 82 F.3d 1101, 1107–08 (D.C.Cir.1996) (prior bad acts evidence admissible to show predisposition in response to entrapment defense). We conclude that deMesones's first argument undercuts any force his second might otherwise

have. According to deMesones, the admitted statements were mere boasts to Best, intended to impress him with deMesones's familiarity with drug commerce and to secure a sale. As such, they are relevant under *Neville* to his eagerness to deal with Best and to his predisposition, regardless of their similarity *vel non* to the charged offenses. Accordingly, the statements are admissible under Federal Rule of Criminal Procedure 404(a). Nor are we persuaded, as deMesones urges, that the statements should have been excluded under Rule 403 as more prejudicial than probative. Their relevance, and therefore probative value, has been established and any potential prejudice was minimized by the district court's instruction to the jurors that evidence of deMesones's "conversations with the undercover officer about matters which are not charged in this case" "was offered for a limited purpose and may be considered only with regard to state of mind of the parties to those discussions" and "may not be considered for any other purpose." Tr. 11/17/93 at 12; see *Neville*, 82 F.3d at 1108 (upholding under Rule 403 evidence of prior crime where it "had substantial probative value of predisposition" and "the court limited the danger that the jury would misuse this evidence by giving a strict limiting instruction").

 deMesones also argues that the prosecutor's reference during closing rebuttal to his muling constitutes reversible error because no evidence of the incident was before the jury. Because deMesones failed to object below on this particular ground, we review for plain error. See *United States v. Catlett*, 97 F.3d 565, 573 (D.C.Cir.1996). Given the isolated nature of the reference and its similarity to the other evidence of drug activity that was admitted, there is simply insufficient prejudice to support a finding of plain error. See *United States v. Merlos*, 8 F.3d 48, 50 (D.C.Cir.1993) (citing *United States v. Olano*, 507 U.S. 725, 732–36, 113 S.Ct. 1770, 1776–79, 123 L.Ed.2d 508 (1993)).

## III. Jury Instructions

A. *"Financial Transaction" in Money Laundering Statute*

The federal money laundering statute, 18 U.S.C. § 1956 (1994), provides that "[w]hoev-

er ... conducts or attempts to conduct a *financial transaction* involving property represented to be the proceeds of specified unlawful activity ... shall be [punished]." 18 U.S.C. § 1956(a)(3) (emphasis added). In order to come within the statute's ambit, a financial transaction must "in any way or degree affect[ ] interstate or foreign commerce...." 18 U.S.C. § 1956(c)(4). With respect to this element of the offense, the district court instructed the jury as follows:

> [T]he government must prove that the defendant conducted a financial transaction. There are several terms used in this element that I will define for you. The term "conducts" includes initiating, concluding or participating in initiating or concluding a transaction. The term "transaction" includes a purchase, sale, transfer, delivery or other disposition. The term "financial transaction" means any transaction as the term has just been defined which in any way or degree affects interstate or foreign commerce. *I instruct you that the sale and purchase of an automobile for cash is a financial transaction within the meaning of the money laundering statute.*

Tr. 1/21/94(A) at 46 (emphasis and quotation marks added).

Appellants argue that the last sentence of the instruction took from the jury the question whether the automobile sales at issue in the case affected interstate or foreign commerce, thereby violating their constitutional right to have the jury determine their guilt as to every element of the crime charged. See *United States v. Gaudin*, —— U.S. ——, ——, 115 S.Ct. 2310, 2320, 132 L.Ed.2d 444 (1995).

 Again, we agree with the Government that appellants have not preserved this argument for appeal. "To preserve an objection to jury instructions, a defendant must raise the specific objection before the trial court." *United States v. Logan*, 998 F.2d 1025, 1030 (D.C.Cir.1993) (citing *United States v. Pryce*, 938 F.2d 1343, 1350 (D.C.Cir. 1991)). Although appellants objected to the financial transaction instruction, they argued

that the instruction's last sentence was "tantamount to the court's giving a directed verdict on the particular element of a financial transaction...." Tr. 1/14/94 at 79. In other words, their objection was that the instruction took the financial transaction element *as a whole* away from the jury, not that it precluded the jury, as they now argue here, from considering the narrower issue of whether the alleged automobile sales affected interstate commerce. Indeed, the words "interstate commerce" appear neither in appellants' written or oral objections to the instructions, nor in their own proposed money-laundering instruction. See Jury Instructions Jointly Proposed by Defense Counsel at 37–38.

 Because appellants' objection was "too general to alert the trial court to their current claim, our inquiry is limited to determining whether the instruction amounted to 'plain error.'" *Pryce*, 938 F.2d at 1350; see also Fed.R.Crim.P. 30, 52(b). In order to support a reversal under the plain error standard, an error must have been "plain" or "obvious" under the law as it stood at the time of trial. See *United States v. Washington*, 12 F.3d 1128, 1138 (D.C.Cir.1994) (citing *Olano*, 507 U.S. at 734, 113 S.Ct. at 1777–78). Although we think that the Supreme Court's reasoning in *United States v. Gaudin* may suggest that even jurisdictional elements, such as § 1956's requirement of a minimal effect on interstate or foreign commerce, must be decided by the jury, we need not resolve that issue today because *Gaudin* had not been decided at the time of appellants' trial. Moreover, the district court's instruction was consistent with the approach taken by several other circuits at the time. See *United States v. Parker*, 73 F.3d 48, 51 (5th Cir.1996) (pre-*Gaudin*, effect on interstate commerce in Hobbs Act prosecution was question for court, not jury); *United States v. Kelley*, 929 F.2d 582, 586 (10th Cir.1991) (transaction in money laundering prosecution under 18 U.S.C. § 1957 must affect interstate

commerce to confer jurisdiction, but effect on interstate commerce not essential element of crime charged). It was thus not plain error.

### B. Entrapment Instructions

All four appellants challenge the district court's refusal to instruct the jury on "continuing entrapment." In addition, appellants deMesones and Smyth raise two other challenges to the entrapment instructions. We find no merit in their objections.

First, the appellants contend the district court should have instructed the jurors that, if they found a particular defendant was wrongfully induced to commit one of a series of offenses, they could find that the entrapment extended to all of the subsequent offenses as well, requiring acquittal on the counts alleging them.[2] We find this argument foreclosed by our recent decision in *United States v. Vaughn*, 80 F.3d 549 (D.C.Cir.1996).

 The heart of the entrapment defense is predisposition. The defendant bears the initial burden of showing "some evidence" he "was induced by the Government to commit a crime for which he lacked any predisposition"; the burden then shifts to the Government "to disprove entrapment by demonstrating beyond a reasonable doubt that the defendant was predisposed to commit the crime." *United States v. Budd*, 23 F.3d 442, 445 (D.C.Cir.1994) (citations omitted). In *Vaughn*, the appellant argued that collateral estoppel prevented a finding of predisposition in his pending prosecution for drug distribution because he had already been acquitted of two other drug distribution charges, purportedly because of entrapment. This court flatly rejected the appellant's argument, noting the obvious:

Sinners may become saints and saints may become sinners. Nothing is necessarily permanent about either state. A person might be disposed to commit a crime one

---

**2.** The specific charge requested read as follows: Where a defendant is charged with more than one offense that allegedly occurred on different dates, if you find that the defendant was entrapped into committing the first offense with which he is charged, you may find that all

alleged criminal acts following were the product of that initial entrapment. If you do so find, you must acquit the defendant of all acts committed after the initial entrapment. Defendants' Proposed Jury Instructions at 53 (Dec. 17, 1993).

day and not disposed to do so some time later. 80 F.3d at 552. The same reasoning applies here. That a particular defendant might have lacked predisposition to launder money once does not mean he lacked it at a later time.[3] If the Government ultimately persuades the jury that the defendant was predisposed to commit a particular crime, the entrapment defense to that offense fails regardless of the verdict on other charged offenses. The Government must of course prove predisposition to commit each offense separately and the court below properly so instructed the jury. See Tr. 1/21/94(A) at 57 ("Just as it is your responsibility to consider each offense and the evidence concerning each defendant separately, it is also your responsibility to consider the evidence concerning entrapment, entrapment [sic] *as to each offense* and each defendant *separately*.") (emphasis added).

deMesones argues individually that the court erred in charging the jurors that "[p]ressure or coercion from a source other than a law enforcement official is . . . not an inducement," Tr. 1/21/94(a) at 56; Tr. 2/2/94 at 62, while rejecting his proposed instruction that "[a] person is entrapped if law enforcement officials, *either directly or through another person,* induced or persuaded a person to commit a crime which he would not otherwise have committed." Proposed Instructions at 50 (emphasis added). Under deMesones's theory, Smyth was a sort of conduit through which the Government entrapped deMesones, even though Smyth was not a Government agent and was unaware that Best was. While it may be possible to establish indirect entrapment through an unwitting intermediary, as we recently noted in *United States v. Layeni,* 90 F.3d 514 (D.C.Cir.1996), the facts here, as in *Layeni,* do not support such a defense.

In *Layeni* a Government informant, at the Government's urging, arranged a meeting between a Government agent and the girlfriend of a known heroin dealer in an attempt to apprehend her boyfriend. As luck would have it, when it came time for the arranged sale, the boyfriend was out of town and the girlfriend sent defendant Layeni in his place. At trial the district court denied Layeni's request for an entrapment instruction and we upheld the court's decision, concluding:

[T]he entrapment defense can be raised by a defendant who was induced by an unknowing intermediary at the instruction or direction of a government official or third party acting on behalf of the government (*e.g.,* an informant). The defense should not apply if, in response to pressure put on him by the government, the unknowing intermediary on his own induces the defendant to engage in criminal activity.

90 F.3d at 520. Here, as in *Layeni,* deMesones was not entitled to the requested instruction because any activity by Smyth aimed at inducing deMesones was undertaken "on his own."

In reaching its decision, the *Layeni* court relied on two circumstances relevant here. First, the court noted that the intermediary girlfriend "deviated from [the informant's] scheme when she allegedly induced Layeni" in place of her boyfriend. Similarly here Smyth's alleged inducement of deMesones was not specifically contemplated by the Government, which had not targeted any particular salesperson. Best simply told Smyth he wanted to purchase an Infiniti and Smyth himself selected deMesones as the potential seller. Second, the *Layeni* court observed that "even if [the girlfriend] had induced [the boyfriend], the intended target of the Government's sting, [the boyfriend] would not be entitled to an entrapment instruction because there is no evidence that [the informant] suggested that [the girlfriend] should 'use inducements' to bring him to the table." 90 F.3d at 518–19 (citing *United States v. Goodacre,* 793 F.2d 1124, 1125 (9th Cir.), *cert. denied,* 479 U.S. 993, 107 S.Ct. 595, 93 L.Ed.2d 595 (1986); see *United States v. Hernandez,* 995 F.2d 307, 313 (1st Cir.), *cert. denied,* 510 U.S. 954, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993)). Here too there is no

---

**3.** Smyth, Adamson and Spriggs were all acquitted of one money laundering offense that preceded at least one offense on which each was convicted. deMesones was convicted of each substantive money laundering charge with which he was charged.

evidence that Best suggested that Smyth should "use inducements" to entrap any Rosenthal salesperson, much less deMesones in particular.

Finally, appellant Smyth argues the court erroneously instructed the jurors that "[l]aw enforcement officials ... may properly assume the roles of criminal organizations," Tr. 1/21/94(A) at 55, and that the legality and propriety of such conduct "should concern [the jurors] only to the extent that [they] may or may not find it constituted inducement." Tr. 2/2/94 at 64–65. Smyth contends these instructions eviscerated his defense that Best entrapped him through "kingpin" tactics of threat and intimidation. His argument, however, misses the point of the challenged instructions which expressly informed the jurors, as Smyth apparently wanted, that they *could* consider the Government's "criminal" conduct insofar as it might constitute inducement. In fact, the court twice specifically instructed the jurors that inducement could consist of conduct such as "threats," "coercive tactics" and "harassment," precisely the kind of conduct Smyth attempts to characterize as inducement. See Tr. 1/22/94(A) at 55; Tr. 2/2/94 at 62.

## IV. Sentencing Issues

Each of the four appellants appeals his sentence. We affirm all four *in toto*.

### A. Smyth

Appellant Smyth asserts the district court erred in (1) adjusting his offense level upward under U.S.S.G. § 3B1.1(b) on account of his alleged role as a "manager or supervisor" and (2) refusing to depart downward based on the "inflated" value of the automobiles allegedly sold. We find neither argument persuasive.

■ First, Smyth argues that he played no managerial or supervisory role in the alleged conspiracy but was at most a mere "middleman." In reviewing the upward adjustment, "we give due deference to the district court's application of the sentencing guidelines to the facts, and we accept the district court's findings of fact unless they are clearly erroneous." *United States v. Kel-*

*ley*, 36 F.3d 1118, 1128 (D.C.Cir.1994) (citing 18 U.S.C. § 3742; *United States v. Kim*, 23 F.3d 513, 516 (D.C.Cir.1994)). The evidence showed that Smyth, a general manager in the Rosenthal organization, voluntarily undertook to and in fact did coordinate each charged transaction after the first, putting Best in touch with hand-picked "cool" salesmen, that he profited from the transactions and that he was viewed by the salesmen as the central figure in the Rosenthal money laundering operations, see, e.g., Tr. 11/8/93(B) at 17, 7 (salesman Gladden sought Smyth's *permission* to conduct cash sale to Best and described Smyth as "a good hands on manager" who "knows what's happening in his dealership"); Gov. Ex. Two, Tr. 1 at 4 (salesman Ennis attributed to Smyth "that much pull" that he could call neighboring Rosenthal Infiniti dealership to arrange cash purchase for Best); Tr. 12/1/93(A) at 51 (Adamson told Best Smyth had characterized him as one of Smyth's "best customers"). Accordingly, we accept the district court's determination that Smyth was a "supervisor" under section 3B1.1(b) and affirm the upward adjustment. *Cf. United States v. Strothers*, 77 F.3d 1389, 1393–94 (D.C.Cir.1996) (affirming upward supervisory adjustment for two conspirators who "directed and profited from numerous drug sales carried out by subordinate 'runners' ").

■ Second, Smyth argues the sentencing court erroneously failed to acknowledge its authority to depart under U.S.S.G. § 5K2.0 based on the "offense level inflation" caused by the massive vehicle purchases toward the end of the sting. The court, however, considered—and rejected—this departure ground. At the sentencing hearing, the court found "from the months that we spent together at trial, there was no improper government conduct and no so-called sentencing factor manipulation or however it might be characterized" and therefore concluded "there is no valid basis for a downward departure." Tr. 7/20/94 at 32–33. Thus, to the extent, if any, that the court was authorized to depart on the cited ground it recognized its authority and declined to do so. This "discretionary" decision not to depart is unreviewable. See *United States v. Pinnick*,

47 F.3d 434, 439 (D.C.Cir.1995) (citing *United States v. Salmon*, 948 F.2d 776, 780 (D.C.Cir.1991)).[4]

### B. Adamson

■■■■ Appellant Adamson challenges the sentencing court's refusal to depart based on "imperfect entrapment." According to Adamson's theory, he presented so much evidence of "law-abiding disposition" that the court was required to consider departing because he was in fact entrapped. We reject this argument as well. At the sentencing hearing, the court stated regarding Adamson's request: "I have thought more than Mr. Adamson could ever truly recognize about all of the sentencings in this case and have come to the conclusion that no departure would be appropriate in this case." Tr. 7/18/94 at 39. The court gave no detailed explanation of its decision and Adamson sought none. Because Adamson neglected his "initial responsibility to ensure that the district court explains its reasoning for the record," "we assume 'that the district court kn[ew] and applie[d] the law correctly,' and that ... it had the authority to depart, but exercised its discretion and decided not to do so here." *United States v. Pinnick*, 47 F.3d 434, 439–40 (D.C.Cir.1995) (internal citation omitted).

### C. deMesones

■■■■■ deMesones asserts the court erred in rejecting the presentencing report's recommendation of a two-point reduction for acceptance of responsibility. See Tr. 6/21/94 at 14. We perceive no such error. "Trial judges are given great latitude in administering th[e] subjective test" for determining whether a defendant has accepted responsibility. *United States v. Washington*, 969 F.2d 1073, 1081 (D.C.Cir.1992) (noting this court had "give[n] trial judges 'at the least,' the 'clearly erroneous' standard of review") (quoting *United States v. Taylor*, 937 F.2d 676, 680 (D.C.Cir.1991)). Although deMesones apparently expressed regret to both the probation officer, see deMesones Presentence Investigation Report at 44 ¶ 147, and to the court, see Tr. 6/21/94 at 21–23, in the end he blamed his misconduct on his six years of military "conditioning" to follow orders and his thirteen years of conditioning to sell cars. See Tr. 6/21/94 at 21. We cannot say that the district court abused its discretion in concluding that "the totality of the circumstances" did not justify an acceptance of responsibility adjustment. See Tr. 6/21/94 at 14.[5]

### D. Spriggs

■■■■■ Finally, appellant Spriggs contends the district court erred in sentencing

---

**4.** According to Smyth, both the sentencing court and the Government failed to appreciate the distinction between "Government overreaching" and the inflation that occurred here as a result of the Government's large purchases toward the end of the sting. Frankly, so do we.

**5.** Under these circumstances, we need not reach the question whether or when an entrapment defense may be consistent with an acceptance of responsibility adjustment. See *United States v. Emenogha*, 1 F.3d 473, 482 (7th Cir.1993) ("As we have recently noted, '[w]here a defendant persists in asserting entrapment, she cannot also claim acceptance of responsibility.'") (quoting *United States v. Simpson*, 995 F.2d 109, 112 (7th Cir.1993)); *United States v. Hansen*, 964 F.2d 1017, 1021–22 (10th Cir.1992) ("find[ing] that the district court correctly determined that the defendant does not qualify for a reduction for acceptance of responsibility" where he "attempted to place the blame for his selling drugs upon the government inducement"), *cert. denied*, 510 U.S. 1080, 114 S.Ct. 901, 127 L.Ed.2d 92 (1994); *United States v. Demes*, 941 F.2d 220, 222 (3d Cir.) ("While it is conceivable to hypothesize a case in which a plea of entrapment would not be inconsistent with the acceptance of responsibility, here we cannot hold that the court erred in not allowing the reduction because the claim of entrapment was made by a person who in no circumstances could have had a justification for possession of the cocaine."), *cert. denied*, 502 U.S. 949, 112 S.Ct. 399, 116 L.Ed.2d 348 (1991); see also *United States v. Davis*, 36 F.3d 1424, 1435–36 (9th Cir.1994) ("not[ing] that the district court could not have found that [the defendant] had not accepted responsibility solely because he presented an entrapment defense at trial"), *cert. denied*, —— U.S. ——, 115 S.Ct. 1147, 130 L.Ed.2d 1106 (1995). But see *United States v. Fleener*, 900 F.2d 914, 917–18 (6th Cir.1990); ("[W]e find that the district court did not err in considering a reduction for acceptance of responsibility even though appellee raised an entrapment defense at trial. Such a defense is no less inconsistent with the Guidelines provision than is a plea of not guilty, which does not raise an absolute bar to a court's consideration.").

**1264**

him as a minor rather than as a minimal participant under U.S.S.G. § 3B1.2. Once again we defer to the district court's decision. "The application of section 3B1.2 is inherently fact-bound and largely committed to the discretion of the trial judge." *United States v. Caballero,* 936 F.2d 1292, 1299 (D.C.Cir. 1991). The commentary to the guidelines notes that to qualify as a "minimal" participant, a defendant must be "plainly among the least culpable of those involved in the conduct of a group" and observes that "lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." U.S.S.G. § 3B1.2 comment. n.1. The commentary further notes:

> It is intended that the downward adjustment for a minimal participant will be used infrequently. It would be appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs.

*Id.* n. 2. Spriggs's role, as earlier noted, was not so insignificant. He participated in at least three transactions in various capacities. Given the extent of his actions, we cannot say the district court abused its discretion in finding his participation more than minimal.

For the preceding reasons the judgments of the district court are

*Affirmed.*