# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 7, 2008　　　　Decided April 25, 2008

No. 06-3129

UNITED STATES OF AMERICA,
APPELLEE

v.

WILLIAM RAY BRYANT, *A/K/A* DERRICK TONGUE,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 05cr00139-01)

---

*Lisa B. Wright*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A.J. Kramer*, Federal Public Defender. *Lara G. Quint*, Assistant Federal Public Defender, entered an appearance.

*John P. Gidez*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *Roy W. McLeese, III* and *Thomas J. Tourish, Jr.*, Assistant U.S. Attorneys.

Before: RANDOLPH and GRIFFITH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

Concurring opinion filed by *Circuit Judge* RANDOLPH.

EDWARDS, *Senior Circuit Judge*: Appellant William Bryant and his co-defendant, Timothy Walker, were arrested on February 9, 2005 and subsequently charged with possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d), and possession of a firearm and ammunition by a felon, in violation of 18 U.S.C. § 922(g)(1). Both men were convicted on March 27, 2006 on both counts. On August 29, 2006, appellant was sentenced to concurrent prison terms of 46 months on each count, followed by three years of supervised release.

On appeal, Bryant alleges that his convictions on both counts should be overturned because the Government presented insufficient evidence that he constructively possessed the two weapons in question, and because the District Court gave an erroneous and misleading supplemental jury instruction regarding the definition of constructive possession. In the alternative, he argues that the unregistered firearm count should be dismissed, because his trial was commenced beyond the 70-day limit required by the Speedy Trial Act ("STA"), 18 U.S.C. § 3161(c)(1). Finally, appellant seeks a remand of the case with instructions to the District Court to review the preserved jury records from his trial and to hold a hearing to determine whether his jury venire violated the Jury Selection and Service Act ("JSSA"), 28 U.S.C. § 1861 *et seq*.

We reject appellant's sufficiency claim on the § 922(g)(1) charge. After reviewing the trial record "in the light most favorable to the government," *United States v. Booker*, 436 F.3d 238, 241 (D.C. Cir. 2006) (internal quotation marks omitted), we conclude that the jury reasonably "could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Because it

appears that appellant failed to raise his jury instruction claim with the District Court, we normally would be constrained to review this claim pursuant to the narrow plain error standard. *See United States v. Olano*, 507 U.S. 725, 731-32 (1993). This is a moot question, however, because we find no error. We also find no violation of the JSSA.

Finally, we reverse appellant's conviction on the § 5861(d) charge – possession of an unregistered firearm – because his trial was commenced more than 70 non-excludable days after the speedy trial clock began running, in violation of the STA. We remand the case with instructions to the District Court to dismiss Count One of the superseding indictment and determine whether the dismissal should be with prejudice.

## I. BACKGROUND

On February 9, 2005, Officer Charles Monk of the Metropolitan Police Department (MPD) was working an off-duty security job at the Red Roof Inn in the Chinatown area of Washington, D.C. At about 3:00 a.m., Officer Monk observed a black Land Rover sport utility vehicle ("SUV") pull up and park in the 800 block of 5th Street N.W. Two men exited the SUV while it was parked illegally in a bus zone. The driver, who was later identified as Timothy Walker, wore a ski mask that partially obscured his face, and a black and red Chicago Bulls hat. The passenger – later identified as the appellant – also wore a ski mask. Although it was an unusually mild night, both men wore heavy black winter coats; in contrast, other people in the area were wearing light jackets and t-shirts without jackets. After Walker stepped out of the SUV, he reached back inside and, from the rear of the SUV, retrieved a bulky item which he slid inside his coat. Appellant also leaned into the SUV, but Officer Monk did not see him retrieve anything.

Walker and appellant crossed the street and headed toward a charter bus that was parked in the 500 block of H Street and

waiting for passengers. Walker was "kind of limping[,] favoring his left side." Trial Tr. (3/21/06) at 50 (Testimony of Officer Monk). Appellant and Walker kept looking at each other and then finally approached the front of the bus. Officer Monk briefly lost sight of the two men, but saw the bus driver stand and look towards the door of the bus while shaking his head. Walker and appellant started walking away from the bus, "back towards the corner of Fifth and H Street." *Id.* at 52. Officer Monk noted that the two men were communicating with each other nonverbally. Walker and appellant stood in an alley for a minute or two, then walked back to the SUV. Appellant got into the vehicle, while Walker "walked to the driver's side, and he opened the door, retrieved the item out of his jacket, placed it in back, [and] got inside the vehicle." *Id.* at 55. Then Officer Monk watched them drive northbound on Fifth Street.

One to two minutes later, Officer Monk saw the same vehicle circling back to the area. They parked in a legal parking space that was approximately 15 feet in front of their earlier parking spot. Officer Monk observed that Walker "reached back into the vehicle, retrieved an item," and "stuck it back down inside his jacket. This time he pulled his face mask back down over his face." *Id.* at 56. Appellant also pulled his face mask down. Appellant "walked freely, as if nothing was wrong with him," but Walker was limping, "favoring his left side." *Id.* at 57. They walked back towards the bus, and Officer Monk called the police dispatcher to request assistance to stop "two suspicious males." *Id.* Officer Monk indicated that he "believed that one of the individuals had a weapon." *Id.* at 58.

Meanwhile, Walker and appellant stood on the corner of 6th and H Streets. Both men were "looking around nervously" when Officer Monk saw a marked FBI police car drive by. *Id.* at 59. The men noticed the car as well, and both of them moved their ski masks so that their whole faces were revealed. Two MPD police cars then arrived on the scene. Officer Monk used

his radio to speak with the officers in one of the police cars – Officers James Burgess and Steven Greene – and gave them a description of Walker and the appellant.  Appellant and Walker "began to walk away" from the area; after turning onto Sixth Street, they "began walking at a faster than normal pace."  *Id.* at 134 (Testimony of Officer Greene).  Walker was walking "with a limp, stiff legged" as if he "were trying to conceal or carry a large object in a portion of [his] body under [his] clothes."  *Id.* at 135.  Officers Burgess and Greene got out of their squad car and approached Walker and appellant.  They asked the two gentlemen to stop.  Appellant remained on the scene and was detained by Officer Burgess.  Walker, however, broke into a "full sprint," showing no sign of a limp.  *Id.* at 144.  Walker was cornered a few blocks later by Officer Greene and another police officer in a fenced-in area behind the MPD Traffic Division building at 501 New York Avenue, N.W.  Officer Greene ordered Walker to get on the ground.  "As he was getting on the ground," Walker "dropped a .12-gauge shotgun into" an "exterior window basin."  *Id.* at 143.  According to Officer Greene, the shotgun appeared to have been concealed in Walker's sleeve.  *Id.* at 144.  After Walker was taken into custody, Officer Greene, using a flashlight, looked through the grate into the window well and saw the shotgun.  *Id.* at 193.  Meanwhile, MPD Officer Steven Schwalm, who had also responded to the call for assistance, found a sawed-off shotgun on the passenger's side floorboard of the SUV that Walker and Bryant had been using.

Officer Burgess patted down appellant while detaining him, but found no weapons of any kind.  The shotgun recovered from the window well was a sawed-off Stevens .12-gauge shotgun, loaded with one .12-gauge shotgun shell.  The firearm found in the SUV was a sawed-off, Harrington and Richardson Bay State Model 7 shotgun.  The Harrington and Richardson gun was 18 inches long (with a 12-inch barrel).  The weapon had been modified in a way that required it to be registered in the National

Firearms Registration and Transfer Record. It was not registered, however. No fingerprints were recovered from either gun. A partial print was recovered from the shotgun shell, but it was of no value.

Appellant and Walker were each indicted on one count of possessing an unregistered firearm in violation of 26 U.S.C. § 5861(d) on April 21, 2005. This indictment was defective, because it specified that appellant and Walker had possessed both shotguns without properly registering them; however, only the Harrington and Richardson shotgun had to be registered pursuant to 26 U.S.C. § 5845(a). On February 16, 2006 – a week before trial was scheduled to begin – the Government filed a superseding indictment, correcting the error in the unregistered firearm counts by deleting the reference to the gun that had been recovered from the window well and adding felon-in-possession counts against both appellant and Walker, and charging them with possession of the car gun, the window-well gun, and the ammunition from the window-well gun. At a hearing on February 17, 2006, counsel for defendant Walker made an oral motion to dismiss on grounds that the STA had been violated, Hearing Tr. (2/17/06) at 3-4, and subsequently submitted a written motion to dismiss. Counsel for appellant joined the motion to dismiss at a subsequent status conference on March 14, 2006, Hearing Tr. (3/14/06) at 16, but the trial judge denied the motion, *id.* at 29-30. Appellant and his co-defendant stood trial from March 21-23, 2006, and a jury convicted both men on both counts on March 27, 2006.

## II. ANALYSIS

### A. *Standard of Review*

When faced with a defendant's challenge to the sufficiency of the evidence supporting his conviction, this court "review[s] the evidence of record *de novo*, considering that evidence in the light most favorable to the government, and [will] affirm a

guilty verdict where '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002) (quoting *Jackson*, 443 U.S. at 319). Upon review, "we giv[e] full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *United States v. Littlejohn*, 489 F.3d 1335, 1338 (D.C. Cir. 2007) (alteration in original) (internal quotation marks omitted).

If Bryant failed to raise and preserve his objection to the trial court's supplemental jury instruction, his challenge to the instruction would entail only plain error review. FED. R. CRIM. P. 52(b). The plain error standard requires Bryant to establish that the supplemental jury instruction was "(1) a legal error that was (2) 'plain' (a term that is synonymous with 'clear' or 'obvious'), and that (3) affected [his] substantial rights." *United States v. Brown*, 508 F.3d 1066, 1071 (D.C. Cir. 2007) (alteration in original) (internal citations omitted); *see also Olano*, 507 U.S. at 732-34. Even if these three conditions are met, we will correct a plain error as a matter of discretion only "if the error 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.'" *Olano*, 507 U.S. at 736 (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)). We need not decide whether the plain error standard controls here, because we find no "error."

Appellant's allegation that his trial violated the provisions of the STA is "reviewed *de novo* on matters of law, and for clear error as to findings of fact." *United States v. Sanders*, 485 F.3d 654, 656 (D.C. Cir. 2007) (internal citations omitted).

Finally, on his JSSA claim, appellant seeks to have his case remanded to the District Court for discovery and a hearing on the adequacy of the jury venire, suspecting a possible violation of the statute. We will review appellant's JSSA claim *de novo*. *See United States v. Grisham*, 63 F.3d 1074, 1077 (11th Cir. 1995) (reviewing *de novo* "constitutional challenges to jury

selection processes"). Defense counsel first raised the claim that the jury venire was disproportionately white on March 21, 2006 – the day after voir dire was completed – when counsel for Walker moved to disqualify the entire jury. The Government argues that because appellant did not raise his concerns with the jury venire "before the voir dire examination beg[an]," as 28 U.S.C. § 1867(a) requires, he is prohibited from raising the claim now. In *United States v. DeFries*, 129 F.3d 1293 (D.C. Cir. 1997), this court suggested that procedural noncompliance might be overlooked if "the [JSSA] and the jury selection procedures utilized by the district court effectively foreclosed the filing of appellants' motion at an earlier time." 129 F.3d at 1300. However, as in *DeFries*, "we need not decide whether appellant[] would be entitled to such an exception [to the JSSA's timeliness requirement], because appellant['s JSSA] claim is unsupported by the evidence necessary for the court to conclude that there has been a 'substantial' violation of the [Act]." *Id.*

**B.** ***Sufficiency of the Evidence Regarding Constructive Possession***

To convict Bryant of unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(1), the Government was required to prove beyond a reasonable doubt that (1) Bryant knowingly possessed a firearm, (2) the firearm was transported in or affected interstate commerce, and (3) at the time of his possession, Bryant had been previously convicted of a felony. *See United States v. Alexander*, 331 F.3d 116, 127 n.18 (D.C. Cir. 2003). Conviction under 26 U.S.C. § 5861(d) obligated the Government to prove that (1) Bryant knowingly possessed a firearm (2) whose registry in the National Firearms Registration and Transfer Record was required. The parties agreed that both guns were firearms within the definitions of the relevant statutes, that both guns were "possessed, shipped, and transported" in interstate commerce, that the Harrington and Richardson shotgun was not properly registered, and that both appellant and

Walker previously had been convicted of a felony. Thus, all that remained for the Government to prove was that appellant possessed the guns.

"Criminal possession of a firearm may be either actual or constructive." *Alexander*, 331 F.3d at 127. Moreover, "possession need not be exclusive in a single person; joint possession is possible in the criminal law." 1 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 6.1(e) (2d ed.). In order to prove that appellant constructively possessed the guns, the Government was required to show that Bryant "knew of, and was in a position to exercise dominion and control over, the contraband, 'either personally *or through others*.'" *United States v. Byfield*, 928 F.2d 1163, 1166 (D.C. Cir. 1991) (quoting *United States v. Raper*, 676 F.2d 841, 847 (D.C. Cir. 1982)). When evaluating whether Bryant had "dominion and control" over the firearms, "[t]he essential question is whether there is 'some action, some word, or some conduct that links the individual to the [contraband] and indicates that he had some stake in them, some power over them.'" *Byfield*, 928 F.2d at 1166 (quoting *United States v. Pardo*, 636 F.2d 535, 549 (D.C. Cir. 1980)). In other words, the Government's case must rest on "something more than [the defendant's] mere presence at the scene of a criminal transaction." *Pardo*, 636 F.2d at 549; *see also Littlejohn*, 489 F.3d at 1338-39; *Alexander*, 331 F.3d at 127; *In re Sealed Case (Sentencing Guidelines' "Safety Valve")*, 105 F.3d 1460, 1463 (D.C. Cir. 1997). However, proximity *plus* another factor may well be enough to prove that the defendant exercised "dominion and control" over the contraband. "[E]vidence of some other factor – including connection with a gun, proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise – coupled with proximity may suffice [to prove constructive possession]." *Alexander*, 331 F.3d at 127 (internal quotation marks omitted); *see also In re Sealed Case*, 105 F.3d at 1463.

On appeal, counsel for appellant concedes that "viewing the evidence in the light most favorable to the government, there was sufficient evidence that [Bryant] knew of the existence of both guns, and sufficient evidence that he and Walker were doing something in concert." Br. for Appellant at 34. However, counsel argues that "there was no evidence that [Bryant's] gestures implied control over the gun Walker was carrying or that any of his evasive actions related to the gun." *Id.* at 35. Appellant also contends that "the prosecutor's suggestion that Bryant was covering or otherwise exerting control over the car gun" is "purely speculative." *Id.* at 37. We disagree.

First, the Government established that appellant had been in close proximity to both guns during the events in question: Appellant remained close to Walker (and therefore close to the Stevens .12-gauge shotgun on Walker's person) from the time they exited the SUV until they were approached by police officers and Walker ran away. In addition, the Harrington and Richardson firearm was found on the passenger's side floorboard of the SUV – the same SUV in which appellant was seen sitting in the passenger's seat. However, the Government's case was not dependent on proximity alone. Both men were walking in Chinatown at 3:00 a.m., wearing bulky winter jackets and ski masks on a relatively mild evening. The jury heard testimony that Walker had concealed the Stevens .12-gauge gun in his oversized coat. Jurors reasonably might have assumed that Bryant wore similar outerwear in case he decided to carry one of the guns. Jurors also could have inferred from the testimony about Bryant's and Walker's behavior that they were preparing to rob the bus driver or passengers, supplying a possible motive for their actions. Similarly, as counsel for appellant conceded, the nonverbal communication signals between Walker and appellant demonstrated that the two men were acting in concert. Finally, appellant and Walker engaged in evasive conduct. The jury heard testimony that when the two men first observed the police car carrying Officers Burgess and

Greene, they began walking in the opposite direction from the police car and, after turning a street corner, they began walking at a much faster than normal pace.

The Government's constructive possession case against Bryant certainly is not overwhelming. Nonetheless, we must review the evidence "in the light most favorable to the government" in determining whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Wahl*, 290 F.3d at 375 (quoting *Jackson*, 443 U.S. at 319). Given this deferential standard of review, we hold that a reasonable jury could have concluded from the totality of the circumstances that Bryant exercised "dominion and control" over both firearms sufficient to support a conviction under both 18 U.S.C. § 922(g)(1) and 26 U.S.C. § 5861(d). Appellant's proximity to both guns, coupled with his suspicious attire, his initial evasive conduct towards the police officers, and the evidence that Bryant was acting in concert with an individual who was actually carrying one of the weapons on his person, provided adequate evidence for a juror to conclude that Bryant constructively possessed both firearms.

## C. *The Supplemental Jury Instruction*

At the end of the trial, the District Court initially gave the standard "red book" jury instruction on constructive possession. This instruction states in part that an individual "has constructive possession of something when he does not have direct physical control over it, but if he knowingly has both the power and the intent at a given time to control it, either by himself or through another person." Trial Tr. (3/23/06) at 534-35. During its deliberations, the jury sent a note to the District Court, asking "[c]an we have the definition of 'control' w/regard to intent in the definition we've received of constructive possession?" The trial judge met with counsel on March 24, 2006, to discuss the possibility of a supplemental instruction. Lawyers for appellant and Walker wanted the District Court to

reread the original instruction or, in the alternative, to read the definition of "control" from a District of Columbia Court of Appeals case, *Curry v. United States*, 520 A.2d 255 (D.C. 1987). The *Curry* definition states in part that "[d]ominion or control over an object is shown when the accused has some appreciable ability to guide its destiny." *Curry*, 520 A.2d at 263. The Government urged the District Court to read the language from *Alexander*, noting the "plus factors," because, according to the prosecutor, it would provide more clarity for the jury than the *Curry* language. Counsel for both defendants objected on the grounds that the *Alexander* "plus factor" language would confuse the jury. Trial Tr. (3/24/06) at 8-9. In the end, the District Court reread the original instruction, then provided language from the *Curry*, *Pardo*, and *Alexander* decisions. *Id.* at 10-13.

On appeal, appellant objects to the District Court's supplemental instruction, because, in his view, the court's endorsement of "the [*Alexander* plus factor] examples" allowed the jury to find possession without finding "control." Br. for Appellant at 45. Put another way, "[b]y reducing the difficult control inquiry – with which the jury was struggling – to the simpler question of whether there was 'evidence of some other factor' in addition to proximity, the instruction reduced the government's burden of proof and greatly increased the likelihood of conviction." *Id.* This is not precisely the same objection that appellant's counsel raised at trial. Below, appellant did not clearly allege that the *Alexander* instruction reduced the Government's burden of proof; appellant focused more on a claim that the *Alexander* instruction would cause more confusion than it would eliminate. Trial Tr. (3/24/06) at 8-9. If appellant did not properly preserve his supplemental jury instruction argument, we would be obliged to review this claim pursuant to the narrow plain error standard. This is a moot question in this case, however, because we find that the trial court did not err in giving the supplemental instruction.

On this record, it is clear that the District Court did not err at all – much less *plainly* err – when it provided the *Alexander* language as part of its supplemental jury instruction. First, *Alexander* remains controlling precedent in this circuit. Therefore, we can hardly hold that a trial judge abuses his discretion by citing a legal standard whose continued validity has been recently confirmed by this court. *See Booker*, 436 F.3d at 242. Second, the District Court's supplemental instruction clarified the proper role of the *Alexander* factors. In the course of giving the instruction, the trial judge stated that "[o]n another occasion the courts have said . . . evidence of some other factor . . . coupled with proximity, may suffice. And I emphasize 'may' because every case is different. . . . And so you have to keep in mind that [the other courts] were always talking about a particular factual situation that they had, which is undoubtedly not precisely the same factual situation that we have in this case." Trial Tr. (3/24/06) at 12-13. Thus, the trial judge afforded the jury the benefit of the *Curry*, *Pardo*, and *Alexander* explanations of constructive possession, and then emphasized that, although the "plus factors" might help illuminate whether either defendant exercised "dominion or control," the plus factors could not be substituted for the ultimate question. The jury was not left confused. In sum, the trial court's supplemental instruction did not constitute error.

## D. *The Speedy Trial Act*

"The [Speedy Trial] Act generally requires a federal criminal trial to begin within 70 days after a defendant is charged or makes an initial appearance, [18 U.S.C.] § 3161(c)(1), but the Act contains a detailed scheme under which certain specified periods of delay are not counted [towards the 70-day clock]." *Zedner v. United States*, 547 U.S. 489, 492 (2006). Appellant argues that his conviction under 26 U.S.C. § 5861(d) should be reversed because his trial on that count began more than 70 non-excludable days after the speedy

trial clock began running. The Government argues that certain actions tolled the speedy trial clock such that fewer than 70 days passed before appellant's trial began. Appellant is correct: The speedy trial clock could not be tolled for the lengths of time sought by the Government, and as such we dismiss appellant's indictment on the § 5861(d) charge.

Both parties agree that although Bryant was arrested on February 9, 2005, and arraigned on May 4, 2005, the speedy trial clock only began ticking on June 11, 2005 – the day after his co-defendant's arraignment in the District of Columbia. 18 U.S.C. § 3161(h)(7); *Henderson v. United States*, 476 U.S. 321, 323 n.2 (1986) ("All defendants who are joined for trial generally fall within the speedy trial computation of the latest codefendant."). As noted above, the initial indictment of both appellant and Bryant was faulty. A superseding indictment was not filed until February 16, 2006 – more than a full year after their arrest. The new indictment charged Bryant with one count of violating 26 U.S.C. § 5861(d), correctly noting that only the Harrington and Richardson shotgun was carried in violation of § 5861(d), but added the felony possession charge pursuant to 18 U.S.C. § 922(g)(1). Defense counsel moved to dismiss the superseding indictment based on the STA, but the trial judge denied the motion. Trial finally began on March 20, 2006.

We note that "the filing of a superseding indictment does not affect the speedy trial timetable for offenses either charged in the original indictment or required under double jeopardy principles to be joined with such charges." *United States v. Marshall*, 935 F.2d 1298, 1302 (D.C. Cir. 1991). Thus, the critical time frame in this case remains the period between June 2005 and March 2006. The parties agree that as of August 8, 2005, at least 32 non-excludable days had been logged on the speedy trial clock. Br. for Appellee at 23; Reply Br. for Appellant at 3. We focus our attention on the Government's two arguments for tolling the speedy trial clock during the period

between October 28, 2005 and February 16, 2006. Because we find that more than 39 non-excludable days passed during that time period, we agree with appellant that his speedy trial rights were violated.

The Government first argues that the time period between October 28, 2005 and February 16, 2006 is excluded because the Government had an outstanding motion filed with the District Court at that time. *See* 18 U.S.C. § 3161(h)(1)(F) (stating that the speedy trial clock will be tolled for "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion"). On August 8, 2005, the Government filed two documents titled "Notice of Intention and Motion to Admit Evidence of Defendant's Prior Conviction Pursuant to Federal Rule of Evidence 609" – one for each defendant. At a status hearing on October 7, 2005, Walker's counsel requested an opportunity to respond to the Government's Rule 609 filing. Hearing Tr. (10/7/05) at 125. The District Court granted permission for counsel to respond, but noted in his order after the hearing that any response had to be filed prior to the status conference scheduled for October 28, 2005. As of the October 28 status hearing, no response had been filed; in fact, neither defense counsel filed a response to the Rule 609 submission until March 16, 2006. The Government argues that the entire time period after August 8 is excluded for STA purposes, because the Rule 609 filing was pending per § 3161(h)(1)(F) until trial began on March 20, 2006.

Appellant responds that the speedy trial clock was not tolled after August 8 because the Rule 609 filing was not a motion and, thus, it did not trigger § 3161(h)(1)(F)'s tolling provision. In *United States v. Harris*, 491 F.3d 440 (D.C. Cir. 2007), we held that a document titled "Government's Notice of Intent To Impeach Defendant [Harris] with His Prior Convictions Pursuant to Federal Rule of Evidence 609" was "not a motion,"

but that the defendant's "response 'request[ing] that the Court preclude the admission of the above mentioned evidence at trial' was one, and it tolled the clock . . . from the date of its filing." 491 F.3d at 443-44 (alterations in original). Appellant argues that, under *Harris*, *the time prior to March 16, 2006* – when appellant filed a response to the Rule 609 filing – cannot be excluded from the speedy trial clock, because appellant's answer to the Rule 609 filing was not a response to a government "motion." The Government claims that *Harris* is distinguishable because the document the Government filed in that case was merely called a notice, whereas the submission in this case was styled as a motion and repeatedly referred to as such by both parties and the trial judge. Additionally, the Government's filing included an attached proposed order, "thus seeking a ruling from the district court." Br. for Appellee at 24.

We need not decide whether the Government's Rule 609 filing was a "motion" for § 3161(h)(1)(F) purposes, however. Even assuming *arguendo* that it was a motion, it would not have tolled the STA for as long as the Government claims. In *Henderson*, the Supreme Court held that "all time between the filing of a motion and the conclusion of the hearing on that motion" should be excluded from the speedy trial clock, whether or not the delay was "reasonably necessary." 476 U.S. at 330. However, the Court differentiated between motions that require a hearing – in which case, all time is excluded, whether "reasonably necessary" or not – and motions that were decided solely on the basis of paper submissions to the trial court. For motions that do not require a hearing, § 3161(h)(1)(J) tolls the speedy trial clock only for "delay reasonably attributable to any period, *not to exceed thirty days*, during which any proceeding concerning the defendant is actually under advisement by the court." 18 U.S.C. § 3161(h)(1)(J) (emphasis added). As the *Henderson* Court explained:

[18 U.S.C. § 3161(h)(1)(F)], written in the disjunctive, excludes time in two situations. The first arises when a pretrial motion requires a hearing: subsection (F) on its face excludes the entire period between the filing of the motion and the conclusion of the hearing. The second situation concerns motions that require no hearing and that result in a "prompt disposition." There, the promptness requirement was "intended to provide a point at which time will cease to be excluded, where motions are decided on the papers filed without hearing." S. Rep. No. 96-212 [(1979)], at 34. The "point at which time will cease to be excluded" is identified by subsection (J), which permits an exclusion of 30 days from the time a motion is actually "under advisement" by the court. *Without the promptness requirement in subsection (F), a court could exclude time beyond subsection (J)'s 30-day "under advisement" provision simply by designating the additional period as time "from the filing of the motion" through its "disposition" under subsection (F).* As the Senate Committee on the Judiciary explained:

> "In using the words 'prompt disposition', the committee intends to make it clear that, in excluding time between filing and disposition on the papers, the Committee does not intend to permit circumvention of the 30-days, 'under advisement' provision contained in Subsection (h)(1)(J). Indeed, if motions are so simple or routine that they do not require a hearing, necessary advisement time should be considerably less than 30 days." *Ibid.*

476 U.S. at 329 (emphasis added).

In the instant case, the District Court never held a hearing on the Rule 609 question, nor did it ever indicate that such a hearing might be required. Thus, once Walker's counsel failed to file a timely response on or before October 28, 2005, the Rule

609 filing was "under advisement" by the District Court. This meant that the trial judge could toll the speedy trial clock only for an additional 30 days while deciding the motion. As of November 27, 2005, however, time began accruing on the speedy trial clock again.

Allowing the District Court to exclude the time from November 27, 2005 until February 16, 2006 would defeat the purpose of the STA. Defense counsel chose not to file a response to the Rule 609 motion within the court's prescribed deadline, so the time began accruing again under the STA at the end of November 2005. The statute "was designed not just to benefit defendants but also to serve the public interest by, among other things, reducing defendants' opportunity to commit crimes while on pretrial release and preventing extended pretrial delay from impairing the deterrent effect of punishment." *Zedner*, 547 U.S. at 501. The time between November 27, 2005 and February 16, 2006 cannot be excluded pursuant to the 18 U.S.C. § 3161(h)(1)(F) exemption.

The Government also argues that the time period from October 28, 2005 until February 16, 2006 is excluded because the STA allows for the tolling of the speedy trial clock if a judge grants a continuance "on the basis of [the judge's] findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(8)(A). The STA specifies that the trial judge must "set[] forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice" are best served by the continuance. *Id.* Various factors are listed for trial judges to take into account in making the "ends of justice" determination. 18 U.S.C. § 3161(h)(8)(B)(i)-(iv).

At the October 28, 2005 status hearing, after a short conversation where both parties and the District Court tried to accommodate one another's schedules, the trial judge set a tentative trial date for late February 2006. Hearing Tr.

(10/28/05) at 2-5. At the March 14, 2006 hearing on the motion to dismiss on STA grounds, the trial court judge stated that, although he "[did not] have a transcript of the October 28th hearing," he thought he had "probably made a finding that [the time period until February 22, the original trial date, was] waived in the interest of justice," to "coordinate the schedules of the prosecutor, the two defense lawyers, and the Court," because "otherwise we would force one or the other of the defendants to go to trial with somebody who is not their lawyer, or a lawyer who is just coming off another trial." Hearing Tr. (3/14/06) at 10. The trial judge went on to say that he "[did not] know whether the statute or the case law requires an explicit finding," but he thought "it would have been implicit if we were going to postpone all the way to the end of February." *Id.* at 17. The judge subsequently denied the motion to dismiss. *Id.* at 26-30. The Government claims that the speedy trial clock was thus properly tolled from October 28, 2005 until the trial began under the § 3161(h)(8)(A) exclusion.

The Supreme Court's decision in *Zedner* – which was handed down approximately two months after the trial court denied the motion to dismiss – forecloses the argument that the Government now makes on appeal. *Zedner* makes it plain that "implicit" findings are insufficient to invoke the § 3161(h)(8)(A) exclusion. The *Zedner* Court held that before a judge could toll the speedy trial clock under § 3161(h)(8)(a), the judge had to make "express findings" about why the ends of justice were served by a continuance, 547 U.S. at 506, and those findings had to be "put on the record by the time a district court rules on a defendant's motion to dismiss under [18 U.S.C.] § 3162(a)(2)." *Id.* at 507. The Supreme Court placed special emphasis on what it called the "procedural strictness" of the STA, *id.* at 509, and in particular on the trial judge's obligation to make findings that give due consideration to the weighty interests in favor of a speedy trial that the STA was meant to embody.

The exclusion of delay resulting from an ends-of-justice continuance is the most open-ended type of exclusion recognized under the Act and, in allowing district courts to grant such continuances, Congress clearly meant to give district judges a measure of flexibility in accommodating unusual, complex, and difficult cases. But it is equally clear that Congress, knowing that the many sound grounds for granting ends-of-justice continuances could not be rigidly structured, saw a danger that such continuances could get out of hand and subvert the Act's detailed scheme. The strategy of § 3161(h)(8), then, is to counteract substantive open-endedness with procedural strictness. This provision demands on-the-record findings and specifies in some detail certain factors that a judge must consider in making those findings.

*Id.* at 508-09.

In this case, the District Court made no express findings supporting a § 3161(h)(8)(A) continuance at the October 28, 2005 status conference. Although *Zedner* permits trial judges to put their findings on record at the time they rule on a STA motion to dismiss, rather than at the time when they grant the continuance, the passing reference to the "interest of justice" made by the trial judge at the March 14, 2006 status hearing does not indicate that the judge seriously considered the "certain factors" that § 3161(h)(8)(A) specifies. *See Zedner*, 547 U.S. at 507 ("[T]he District Court set forth no such findings at the January 31 status conference, and § 3161(h)(8)(A) is not satisfied by the District Court's passing reference to the case's complexity in its ruling on petitioner's motion to dismiss."). *Zedner* makes clear that trial judges are obligated to seriously weigh the benefits of granting the continuance against the strong public and private interests served by speedy trials; there is nothing in the record to indicate that the latter were given any serious consideration by the trial judge when he denied the

motion to dismiss. *See Sanders*, 485 F.3d at 659 ("[I]nsofar as the district court made no mention of the countervailing interests, its August 5 statement fails to meet the Act's requirement of on-the-record findings that a continuance 'outweigh[ed] the best interest of the public and the defendant in a speedy trial.' 18 U.S.C. § 3161(h)(8)(A)." (second alteration in original)). Thus, the speedy trial clock was not tolled between October 28, 2005 and February 16, 2006 pursuant to the § 3161(h)(8)(A) "ends of justice" exclusion.

Given that both parties agree that at least 32 days had accrued on the speedy trial clock as of August 8, and it is clear that at least 39 additional, non-excludable days accrued between November 27, 2005 and February 16, 2006, we find that the STA's 70-day maximum was exceeded. We are therefore obligated to reverse appellant's conviction for possession of an unregistered firearm and remand the case to the District Court with instructions to dismiss the indictment on that count. However, it is for the District Court to determine whether the indictment should be dismissed with or without prejudice. 18 U.S.C. § 3162(a)(2).

**E.** *The Jury Selection and Service Act*

In *Taylor v. Louisiana*, 419 U.S. 522 (1975), the Supreme Court held that "the Sixth Amendment affords the defendant in a criminal trial the opportunity to have the jury drawn from venires representative of the community." 419 U.S. at 537. Although "[d]efendants are not entitled to a jury of any particular composition . . . the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.* at 538. The JSSA codifies this right, stating that federal litigants entitled to a jury trial have "the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861.

Appellant contends that his venire was not comprised of "a fair cross section" of Washington, D.C. due to the underrepresentation of blacks, and thus his rights under the JSSA were violated. The Supreme Court has established the following test for determining violations of the "fair cross section" requirement:

> [T]he defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).

The Government used a variety of statistical methods to calculate the degree to which blacks were underrepresented in appellant's jury venire, and argues that the disproportionate number of blacks did not rise to a legally cognizable level. Appellant does not directly refute the Government's argument; rather, he argues that the calculations "raise a red flag as to this jurisdiction's jury selection system, particularly in light of the racial skewing that was observed in *United States v. Spriggs*, 102 F.3d 1245 (D.C. Cir. 1996), and *United States v. DeFries*, 129 F.3d 1293 (D.C. Cir. 1997)." Reply Br. for Appellant at 18. However, in neither *Spriggs* nor *DeFries* did the court find that the JSSA had been violated. *See DeFries*, 129 F.3d at 1301; *Spriggs*, 102 F.3d at 1253-54. More importantly, this court noted in *DeFries* that "[u]nderrepresentation of a cognizable group in a single venire, without evidence of a greater pattern, is insufficient to establish the 'systematic exclusion of the group' required by *Duren*." 129 F.3d at 1301 (citing *Duren*, 439 U.S. at 364). In this case, appellant appears to suggest that *DeFries* and *Spriggs* themselves supply evidence that there is "systematic exclusion," but this argument fails for two reasons:

(1) both *DeFries* and *Spriggs* concerned an alleged underrepresentation of whites, whereas this case involves an alleged underrepresentation of blacks; and (2) two cases decided more than 10 years ago, in combination with appellant's own single venire, are insufficient to establish "systemic exclusion" as required by *Duren*. In short, appellant has not offered sufficient reasons to remand this case for further investigation of his venire.

## III. CONCLUSION

For the reasons given above, the judgment of the District Court is affirmed in part and reversed in part. The case is hereby remanded for the District Court to dismiss Count One of the superseding indictment after determining whether the dismissal should occur with or without prejudice.

Randolph, *Circuit Judge*, *concurring*: I agree with the court that Bryant's conviction for possessing an unregistered firearm must be reversed. On remand the district court will have to determine whether to dismiss that count with prejudice or without prejudice. In making this determination I believe the court should take into account Bryant's failure to demand a speedy trial before the statutory period ran.

As criminal defense attorneys know, delaying a trial often works to the defendant's advantage. On the other hand, there are instances when a prompt trial may assist the defense. The "demand rule," as it came to be known, stated that a defendant had "to demand a trial or resist postponement"; if he did neither, he waived his Sixth Amendment right to a speedy trial. *United States v. Lustman*, 258 F.2d 475, 478 (2d Cir. 1958); *see also Bruce v. United States*, 351 F.2d 318, 320 (5th Cir. 1965); *United States v. Hill*, 310 F.2d 601, 603 (4th Cir. 1962). The underpinning of the rule was that the accused cannot have it both ways: he cannot welcome delay and seek to gain an advantage from it and then later avoid trial entirely by having the indictment dismissed because of the delay.

*Barker v. Wingo* relaxed the rigidity of the demand rule. 407 U.S. 514 (1972). The Supreme Court held that a defendant who fails to demand a speedy trial does not forever waive his right to one, but that his failure to make a demand is one of the factors bearing on whether his Sixth Amendment right was violated. 407 U.S. at 528; *see United States v. White*, 443 F.3d 582, 589-91 (7th Cir. 2006).

The Speedy Trial Act provides that a defendant's failure to move for dismissal prior to trial constitutes a waiver of his rights under the Act. 18 U.S.C. § 3162(a)(2). The Act does not require a defendant to make the motion before the statutory time limit has expired. If, as in Bryant's case, the time has expired, the district court must dismiss the indictment but the court has discretion to determine whether to do so with or without

2

prejudice. In making that determination, the court must consider, among other things, "the seriousness of the offense; the facts and circumstances of the case which lead to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice." *Id.* § 3162(a)(2).

Just as a defendant's failure to demand a speedy trial bears on whether the delay violated the Sixth Amendment, a defendant's acquiescence in the delay bears on whether the court should dismiss without prejudice and thus allow the defendant to be reindicted. Defense counsel may have believed that as time passed and memories dimmed the accused would benefit in view of the government's heavy burden of proof. *See Bruce*, 351 F.2d at 320. Or the defendant's attorney may have thought that the chances of a favorable plea bargain would increase as the prosecutor's office became occupied with more pressing business. Or defense counsel may have believed that remaining silent as the clock ticked away would increase the chances of an inadvertent violation of the Act and, hence, dismissal of the indictment. Or the defendant's attorney may have been indifferent to the delay, thinking that it would not hurt his client's case. These considerations and others go to the last two of the factors identified in the Act and also to the question whether the delay damaged the accused's ability to mount a defense.[1] *Barker v. Wingo*, from which the Act's factors appear

---

[1] Here, for example, the decision to delay the trial until February 2006 was made in order to accommodate the schedules of the lawyers for all parties. Hearing Tr. (10/28/05) at 4-5. At a hearing on October 28, 2005, the court discussed trial dates with the parties. *Id.* Bryant opted for a February 2006 trial date over a November 2005 trial date to prevent him from having to find replacement counsel. Bryant affirmatively agreed to the delay because it assisted his ability to mount a defense.

to be derived, recognized as much and so, I believe, should district courts in deciding on the form of relief for a violation of the Act.  407 U.S. at 530-33.